RODGER M. LANDAU (State Bar No. 151456)
rlandau@landaufirm.com
MONICA RIEDER (State Bar No. 263250)
mrieder@landaufirm.com
LANDAU LAW LLP
1880 Century Park East, Suite 1101
Los Angeles, California 90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056

Attorneys for Howard B. Grobstein,
Liquidating Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>SOLID LANDINGS BEHAVIORAL HEALTH, INC., *et al.*,<br><br>    Debtors and<br>    Debtors-In-Possession. | Case No. 8:17-bk-12213-CB<br><br>Jointly Administered With:<br>Case No. 8:17-bk-12218-CB<br>Case No. 8:17-bk-12221-CB<br>Case No. 8:17-bk-12222-CB<br>Case No. 8:17-bk-12223-CB<br><br>Chapter 11 |
| HOWARD B. GROBSTEIN, LIQUIDATING TRUSTEE,<br><br>    Plaintiff,<br><br>v.<br><br>GERIK M. DEGNER,<br><br>    Defendant. | Adv. No. 8:20-ap-_____-CB<br><br>**COMPLAINT FOR BREACH OF FIDUCIARY DUTY** |

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

<cse 8:20-ap-01010-CB    Doc 1    Filed 01/30/20    Entered 01/30/20 16:07:10    Desc
Main Document    Page 2 of 19

Plaintiff is Howard B. Grobstein, Liquidating Trustee (the "Trustee") for the Liquidating Trust (the "Liquidating Trust") of Solid Landings Behavioral Health, Inc. ("Solid Landings"), Sure Haven, Inc., Silver Rock Recovery, EMS Toxicology, and Cedar Creek Recovery, Inc. (collectively, the "Debtors"). As the Trustee was not appointed until after the Debtors filed bankruptcy, the Trustee does not have personal knowledge of the facts alleged in this Complaint and therefore alleges those facts on information and belief.

**JURISDICTION AND VENUE**

1. In accordance with the requirements of Local Bankruptcy Rule 7008-1, the Santa Ana Division of the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334, because the claims asserted herein arise under title 11 of the United States Code (the "Bankruptcy Code") or arise in or relate to the Chapter 11 cases entitled *In re Solid Landings Behavioral Health, Inc.*; *In re Sure Haven, Inc.*; *In re Silver Rock Recovery*; *In re EMS Toxicology*; *In re Cedar Creek Recovery, Inc.*, jointly administered under Case No. 8:17-bk-12213-CB (the "Cases"). The claims for relief in this Complaint constitute a core proceeding under 28 U.S.C. § 157(b)(2)(C) and (O). Regardless of whether this is a core proceeding, consent is hereby given to the entry of final orders and judgment by the Bankruptcy Court. The defendant is hereby notified that Fed. R. Bankr. P. 7008(a) requires the defendant to plead whether the claims for relief alleged against such defendant are core or non-core and, if non-core, whether consent is given to the entry of final orders and judgment by the Bankruptcy Court.

2. Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409 because the Debtors' bankruptcy cases are pending in this district and this division. The Bankruptcy Court has personal jurisdiction over the defendant.

**PARTIES**

3. On June 1, 2017 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.

4. On March 22, 2018, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the *Joint Plan of Liquidation of Solid Landings Behavioral Health, Inc., and Its*

1

*Affiliated Debtors, and the Joint Committee of Creditors Holding Unsecured Claims in Solid Landings Behavioral Health, Inc., EMS Toxicology, and Sure Haven, Inc., Dated November 1, 2017* (the "Plan") [Docket No. 401].

5. Pursuant to the Plan and Confirmation Order, (a) the Liquidating Trust was created, (b) Mr. Grobstein was appointed as the Trustee of the Liquidating Trust, (c) all of the property of the Debtors' bankruptcy estate, including avoidance actions and other litigation claims, was transferred to, and vested in, the Liquidating Trust, and (d) the Liquidating Trust was vested with authority to, among other things, pursue the litigation claims of the Debtors' bankruptcy estate transferred into the Liquidating Trust and to object to claims. Therefore, the Trustee has standing and authority to assert the litigation claims set forth herein.

6. Pursuant to the Plan, the "Effective Date" of the Plan was April 9, 2018. On that date, the Trustee was appointed to administer the Liquidating Trust.

7. Defendant Gerik M. Degner ("Degner"), is, and at all relevant times was, an individual residing or doing business in Orange County, California.

**DEGNER'S INVOLVEMENT WITH THE DEBTORS PRIOR TO APRIL 15, 2016**

8. All relevant times Degner was in sole or primary control of Alpine Pacific Capital, LLC ("Alpine"), a California limited liability company with a primary place of business in Orange County, California.

9. As described by Degner in a declaration filed in the Cases, Degner first became involved with the Debtors in or around May 2015. Specifically, Degner stated, "On May 28, 2015, in my capacity as a Founding Partner of Alpine, I was engaged by the shareholders of Solid Landings Behavioral Health, Inc., . . . and certain of its affiliates and subsidiaries, including Sure Haven, Inc. . . . (collectively, the 'Companies') to act as a special advisor and consultant to the Companies in connection with a possible recapitalization or sale of the Companies. As part of that engagement, Alpine was to provide marketing, negotiating, and other services in connection with the possible merger, consolidation, buyout, recapitalization, or acquisition or sale of Companies' assets involving all or any portion of the business, assets, or equity interests of the Companies and/or their subsidiaries, in one or more transactions." Docket No. 107 in Case No. 8:17-bk-12213-

2

CB (the "Degner Declaration"), para. 3.

10. During the period from May 2015 through December 2015, Degner was heavily involved with the effort to market the Debtors led by Brentwood Capital Advisors, LLC ("Brentwood"). For example, Degner stated that he "personally participated in numerous preparation sessions with the Shareholders and Brentwood for management's meetings with interested buyers to provide input from a buyer's perspective" and "also attended the management meetings themselves to assist with the buyers' questions regarding the Companies and offering." Degner Declaration, para. 10. During the same period, Degner was personally involved in reviewing and assessing the Debtors' financial condition, including working with the Debtors' Chief Financial Officer and an outside accounting firm on a quality of earnings analysis. Degner Declaration, para. 11.

11. During the period from January 2016 through March 2016, Degner "continued to consult with Solid Landings, through Alpine, on a month-to-month basis in an effort to address issues within the company's financial department." Degner Declaration, para. 14. As part of that effort, Degner "worked closely with another consultant engaged to review the company's revenue cycle management processes" and also was involved with a clinical compliance and quality review and a further quality of earnings analysis. Degner Declaration, paras. 14 & 15.

12. Therefore, during the period from May 2015 through March 2016, Degner not only had access to substantial financial information regarding the Debtors, but was in fact tasked with (and paid for) reviewing and assessing that information to determine the Debtors' financial condition and marketability.

**DEGNER'S KNOWLEDGE OF THE DEBTORS' DISASTROUS FINANCIAL CONDITION AS OF APRIL 15, 2016**

13. As noted above, Degner was intimately involved with the Debtors and their financial affairs from May 2015 through March 2016. As such, he personally witnessed numerous facts and occurrences demonstrating the Debtors' poor and worsening financial condition during that time and the hopelessness of marketing the Debtors as a going concern, including but not limited to those set forth below.

14. In or before August 2015, Solid Landings' "collections had begun to slow and it was experiencing cash flow issues." Solid Landings therefore asked Degner, through Alpine, "to source possible options for bridge financing" to cover Solid Landings' current operating expenses. Degner Declaration, para. 12.

15. In "late summer through fall of 2015," for the first time in their history, the Debtors engaged an outside accounting firm to review their financial statements. Degner personally worked with the accounting firm on their analysis. The accounting firm's "ultimate conclusion was that the Companies' revenue and profit numbers were inflated and severely inaccurate." Degner Declaration, para. 11.

16. In November 2015, the Debtors took on a substantial new debt obligation, in the form of a Loan and Security Agreement entered with CapStar Bank ("CapStar") on November 20, 2015, under which CapStar extended a $7.5 million line of credit to the Debtors.

17. In December 2015, the process of marketing the Debtors was called to a halt due to the Debtors' inability to provide credible revenue figures, without which no third party buyer would be willing to proceed. Degner Declaration, para. 13; *Omnibus Declaration of Katie S. Goodman in Support of Debtors' "First Day" Motions* ("Goodman Declaration"), para. 14.

18. Degner stated in sworn testimony given during a hearing in the Cases that, while the Debtors were never able to fully substantiate their revenues, the best estimate he ultimately obtained was that the Debtors' annual cash flow in 2015 was around $12 million to $14 million. Transcript of July 26, 2017 hearing ("Transcript"), 98:18-25.

19. Whatever the Debtors' revenue may have been at the end of 2015, it declined precipitously thereafter. By 2015, 95% of the Debtors' revenue came from payments made by insurance companies for the substance abuse treatment (and related) services provided by the Debtors. Goodman Declaration, para. 16. As described by Degner in his testimony, those payments "came to a screeching halt in late 2015." Transcript, 100:11. Around the end of 2015, Degner explained, "the payors, the insurance companies, stopped paying. Literally across the industry, there's one, Health Net just stopped paying anybody. You had the Anthems, you had the Cignas and some of the other payors that really took a finer tooth comb to medical necessity and the

4

notes that were going through. . . . So we weren't getting paid. So, in essence, we were providing services for free." Transcript, 104:13–105:1; *see also* Goodman Declaration, para. 16 ("Calendar year 2016 brought a marked decrease in reimbursement rates and slowdown in the timing of reimbursements from the insurance companies, with certain companies such as Cigna and Health Net ceasing payments altogether.").

20. The decline in revenue left the Debtors unable to fund their operations from current income, and, in March 2016, the Debtors asked Degner "to identify possible sources of debt" – in addition to the existing $7.5 million secured debt owed to CapStar. Degner Declaration, para. 16.

21. By April 15, 2016, therefore, Degner knew that (a) the Debtors had extremely poor financial recordkeeping; (b) the Debtors were not able to provide substantiated revenue figures; (c) despite an intensive months-long marketing process in which 50 potential buyers had signed confidentiality agreements to obtain financial information about the Debtors, no third party had committed to buy or invest in the Debtors; (d) the marketing process failed in 2015 – *before* the decline in the Debtors' revenue; (e) following the limitation and/or cessation of insurance payments in late 2015/early 2016, the Debtors' revenue dropped significantly, to the point where Degner believed the Debtors "were providing services for free"; (f) the Debtors had already experienced cash flow problems in mid-2015 – again, *before* the decline in their revenue; (g) the Debtors had been able to resolve their 2015 cash flow problems only by incurring secured debt equal to approximately one-half of their pre-decline annual cash flow; and (h) in March 2016 the Debtors anticipated being unable to fund day-to-day operations without the incurrence of additional secured debt. In short, Degner knew that the Debtors had been unprofitable and unsellable in 2015, and in 2016 had all of the same problems but additionally had lost virtually all of their revenue.

### DEGNER'S APPOINTMENT AS PRESIDENT ON APRIL 15, 2016

22. On April 15, 2016, Degner entered an employment agreement with Solid Landings under which he became the Debtors' president. Degner served as the Debtors' president continuously from April 15, 2016 until after the Petition Date.

23. According to the *Amended Notice of Setting/Increasing Insider Compensation* submitted on behalf of Degner in the Cases on June 22, 2017, as president, Degner "manage[d]

5

[the] day-to-day operations of" the Debtors, and his duties included "provid[ing] direct supervision to management, administrative, accounting and operational personnel, oversee[ing] business operations and cash management, and provid[ing] general corporate oversight." Therefore, during his tenure as president, Degner was involved in every aspect of the Debtors' operations and finances, and exercised oversight and control over both.

24. Degner's appointment as president was due largely to the financial expertise he purported to have and claimed that he would exercise on behalf of the Debtors. Degner testified that he has "a Chartered Financial Analyst charter that is kind of in the finance world, mergers and acquisitions world," and that his career has been focused on "asset management," "investment banking," and "private equity investing." Transcript, 93:7-13. He further testified that he was brought in as president "mostly to work on corporate finance duties." Transcript, 98:6-7. Given Degner's education and experience in the financial realm, and the fact that the Debtors relied on his alleged expertise in corporate finance in selecting him as president, Degner must be held to a higher standard of knowledge and judgment regarding financial matters than a layperson in the same position.

25. However, given the facts alleged above regarding the Debtors' financial position as of April 15, 2016, even a layperson would have recognized that there was no realistic chance of either turning the Debtors into a profitable enterprise or selling them to a third party, and that the only responsible course of action was to immediately wind down the Debtors' business and preserve what value was left for the payment of the Debtors' already substantial debts.

26. As the Debtor's president and purported "corporate finance" expert, and as the primary liaison with the Debtors' secured lender, CapStar, Degner was at all times on and after April 15, 2016, in a position to initiate that wind-down process. In fact, the Debtors' eventual bankruptcy filings, thirteen devastating months later, were instigated by Degner.

27. On April 15, 2016, the same day that Degner became the Debtors' president, the Debtors entered into a consulting agreement with Alpine, under which Alpine was entitled to a success fee of $500,000 if Alpine facilitated various transaction, including the "borrowing by the

Company of at least $8,000,000".[1]  Degner therefore had a substantial financial incentive to see the Debtors continue operating at least long enough to incur sufficient additional debt to trigger his success fee.  In addition, the consulting agreement provided for Alpine to receive an ongoing consulting fee of $33,350 per month, and Degner was personally receiving an annual salary of $50,000, plus benefits.

28.     Instead of immediately initiating a wind-down process on April 15, 2016, Degner caused the Debtors to continue operating for over another year, incurring millions of dollars of additional secured debt (thereby triggering Degner's success fee), suffering tens of millions of dollars of net operating losses, and wasting whatever value there may have been on needless expenditures.  The Debtors and their creditors received no benefit from those continued operations – but Degner was paid more than half a million dollars in the process.

## DEGNER IGNORES MOUNTING ADDITIONAL EVIDENCE OF THE DEBTORS' DIRE FINANCIAL CONDITION

29.     Although, for the reasons set forth above, it was already glaringly obvious on April 15, 2016, that the Debtors were in dire financial straits and had no realistic hope of recovery, every succeeding month provided Degner with yet more evidence of the inevitability of the Debtors' financial demise – information on which he failed to act, in violation of his fiduciary duty of due cae, to protect the Debtors from further economic harm.

30.     For example, on June 16, 2016, the Debtors defaulted on their debt to CapStar.  According to an exhibit attached to the Debtors' subsequent forbearance agreement with CapStar, the defaults included numerous financial issues that breached the Debtors' covenants regarding their financial health, including (a) past-due property taxes on two real properties; (b) overdue rent on 21 real property leases; (c) overdue rent on five vehicle and equipment leases; and (d) past due payments to 37 major vendors, with eleven of whom the Debtors had already entered into payment plans for past-due amounts.

31.     At or around the same time, according to Degner's testimony, the Debtors "really

---

[1] The Trustee has filed a separate complaint against Alpine and Degner seeking to, among other things, avoid that agreement and the payments made thereunder as fraudulent transfers.

started to run out of cash." Transcript, 103:17-18; *see also* Transcript, 101:25–102:2 ("When I got involved as president, then we got into – well, let's call it the summer of 2016, we had some cash, major cash flow issues.").

32.  Degner's solution to the Debtors' cash flow issues was for the Debtors to incur substantial additional secured debt. The Debtors entered into an agreement with CapStar on August 30, 2016, under which CapStar agreed to increase the amount of financing available to the Debtors from $7.5 million to $9.2 million. Degner signed that agreement on behalf of the Debtors – despite the fact that, as he subsequently testified, "we knew [the cash] was not going to last us a long time." Transcript, 106:18.

33.  Degner claimed that, as a result of the increase of the CapStar debt from $7.5 million to $9.2 million, Alpine had facilitated "borrowing by the Company of at least $8,000,000", and therefore was entitled to its $500,000 success fee. Therefore, in addition to increasing their debt to CapStar by $1.7 million, the Debtors also incurred a debt of $500,000 to Alpine for inflicting the additional CapStar debt on them. Due to the Debtors' cash flow problems, the Debtors only paid Alpine $75,000 of that fee upon execution of the forbearance agreement (in addition, of course, to Alpine's regular monthly fee of $33,350), with the remainder being owed to Alpine.

34.  While the Debtors paid Alpine at least a portion of its success fee, they simultaneously ceased to pay one of their most critical expenses – search engine optimization and other internet marketing fees. Both Degner and the Debtors' in-house counsel testified that, in the summer of 2016, internet marketing was virtually the Debtors' only means of acquiring new clients. Transcript, 89:9-19; 102:15–103:21. Once the Debtors ceased to pay for Google ads and other internet advertising, the Debtors were unable to attract new clients and generate revenue. Accordingly, once those marketing payments stopped in the summer of 2016, not only was there no hope of maintaining the Debtors' current limited level of revenue (which was already insufficient to meet current expenses), there was simply no possible way for the Debtors to increase their revenue sufficiently to pay their current expenses, much less their accumulating debt.[2]

---

[2] Degner also testified that the minimum expenditure necessary for a successful Google ad campaign was approximately $20,000 to $30,000 per month. Transcript, 111:14-20. If the Debtors had not been paying Alpine's

8

35. The forbearance agreement with CapStar was set to expire on October 15, 2016, at which time the entire loan amount would become due and payable. However, far from being able to pay off the debt, in October 2016 the Debtors were forced to seek overadvances from CapStar just to meet their current expenses. Degner attempted to convince Pacific Mercantile Bank ("PMB") to take out the CapStar loan, but PMB declined. According to an October 6, 2016 email from Degner to various personnel of the Debtors, the reasons for PMB's refusal to extend credit to the Debtors included "lack of billing system," "slowing collections," and "inability to cover current expenses like payroll (how CapStar has covered us)." Nevertheless, Degner apparently failed to recognize his duty of care to take steps to preserve the Debtors' remaining assets.

36. During the same period, the Debtors were again engaging in fruitless marketing efforts to find a buyer for some or all of their assets. The closest the Debtors came was a signed purchase agreement with a third party for two of the Debtors' California facilities. Degner worked with the potential buyer from approximately September 2016 through January 2017, but was unable to close the sale. In the meantime, however, Degner arranged to be paid $25,000 of the success fee due to Alpine from the potential buyer's earnest money. Degner also negotiated with CapStar to ensure that $150,000 of his fee would be paid from the transaction if it closed – again, giving Degner a substantial financial incentive to continue pursuing the sale of the two California facilities apparently without recognizing and regardless of the cost to the Debtors.

37. On December 22, 2016, the Debtors entered into an amendment of the forbearance agreement with CapStar, which extended the termination date to January 31, 2017. At the time of that amendment, although the Debtors were "maxed out" on their loan with CapStar, CapStar agreed to advance an additional $345,000 to cover the Debtors' payroll costs.

**BANKRUPTCY FILING DELAYED WHILE DEGNER NEGOTIATES TO PURCHASE THE DEBTORS' ASSETS**

38. Although any responsible fiduciary would have wound down the Debtors' operations in April 2016, Degner was unwilling to consider the possibility until February 2017, when it

---

monthly consulting fee of $33,350, they would have been able to make this expenditure.

became evident to Degner that the sale of the the Debtors' two California facilities (which would have paid him $150,000) was never going to happen. At that point, Degner finally suggested the filing of a bankruptcy case, and the Debtors began preparing to file. The original intended bankruptcy filing date was on or around March 1, 2017.

39. At the same time, however, Degner was talking to CapStar about the possibility of Alpine purchasing the Debtors' assets. An employee of CapStar pointed out that a bankruptcy court might be unwilling to bless a sale negotiated by Degner (as president of the Debtors) with Degner (as the principal of Alpine), and suggested that a Chief Restructuring Officer ("CRO") be appointed to mitigate the appearance of impropriety. Following discussions between Degner, CapStar, and potential CROs, Katie Goodman ("Goodman") was appointed as the Debtors' CRO.

40. During March 2017 and early April 2017, Goodman negotiated with Degner regarding Alpine's potential purchase of the Debtors' assets. On April 12, 2017, the Debtors entered a letter of intent with Alpine. Further negotiations occurred over the next six weeks, and the Debtors and Alpine executed an asset purchase agreement on June 1, 2017. The Debtors finally filed bankruptcy that same day.

## $39 MILLION + OF DAMAGES INCURRED BY THE DEBTORS DURING DEGNER'S TENURE AS PRESIDENT

41. As set forth below, the Debtors suffered enormous harm (to the tune of more than $39 million) as a result of the wrongful prolongation of their existence by Degner.

42. The Debtors suffered substantial net operating losses during every month between Degner's appointment as president and the Petition Date – rising as high as $7.5 million in a single month. Specifically, the profit & loss statements prepared by the Debtors for CapStar reflect the following losses:

- May 2016:  $886,825
- June 2016:  $1,245,551
- July 2016:  $1,836,991
- August 2016:  $5,297,702
- September 2016:  $1,426,751

– October & November 2016: $8,123,603[3]

– December 2016: $7,565,638

– January 2017: $4,978,846[4]

– February 2017: $1,847,529

– March 2017: $1,809,693

– April 2017: $1,616,059

43. During the year following Degner's appointment as president, therefore, the Debtors suffered total net operating losses of $36,635,188.

44. Assuming the Debtors' financial performance in May 2017 was consistent with their financial performance for the preceding 12 months, the Debtors would have lost an additional $3,052,923.33 (the average net operating loss for the preceding 12 months) in that month, bringing the Debtors' total net operating loss during Degner's tenure to more than $39 million.

### $600K + OF BENEFITS RECEIVED BY DEGNER DURING HIS TENURE AS PRESIDENT

45. While the Debtors and their creditors were grievously injured by Degner's wrongful prolongation of their existence during his tenure as president, Degner received substantial benefits from that same prolongation.

46. Degner received almost $600,000 in cash from the Debtors (either directly or through his company, Alpine) between April 15, 2016, and the Petition Date. Specifically, Degner personally was paid $131,923.19 and Alpine was paid $463,655.91, for a total of $595,579.10.

47. Payment to Alpine constituted payment to Degner – as demonstrated by the fact that, in March 2017, the Debtors ceased paying the consulting fee to Alpine and increased Degner's personal compensation by the same amount.

48. In addition, as a result of causing the Debtors to incur additional secured debt that he knew they could never repay, Degner (through Alpine) obtained a $400,000 claim against the Debtors, for the remaining unpaid portion of his "success fee". If the sale of two of the Debtors'

---

[3] Calculated based on the difference between the YTD amount in April 2016 and the YTD amount in December 2016.
[4] Calculated based on the YTD amount in March 2017.

11

California facilities had closed, Degner would have been paid an additional $150,000 on account of that claim.

49. Finally, Degner used the knowledge and the relationship with CapStar that he had acquired by virtue of his position as the Debtor's president to secure a substantial advantage in bidding on the Debtors' assets in the spring and summer of 2017. As a result of that advantage, the Debtors filed bankruptcy with Alpine as the "stalking horse" bidder for their assets, and Alpine likely would have been successful in its bid but for the Court's (justified) concerns regarding Degner and Alpine's conflicts of interest and the damage the Debtors had suffered over the preceding 13 months.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

50. The Trustee re-alleges each and every allegation of this Complaint set forth above as if set forth fully herein.

51. At all times between April 15, 2016, and the Petition Date, Degner served as the Debtors' president. As an officer of the Debtors, Degner owed them fiduciary duties, including the duties of care and loyalty.

52. Degner breached his duty of care by failing to initiate a wind-down of the Debtors' operations immediately upon his appointment as president, which would have been the only responsible course of action in light of the Debtors' dire financial condition and lack of any realistic prospect for recovery (as described in paragraphs 14 through 21). Degner continued to breach that duty as he caused the Debtors to operate for an additional thirteen months, despite the continually mounting evidence of the inevitability of their financial demise, including but not limited to (a) substantial net operating losses in every single month after Degner's appointment as president, (b) defaults on more than 50 major contractual and financial obligations by June 2016, (c) continuous cash flow problems and inability to pay current expenses, (d) cessation of spending on internet marketing expenses in summer 2016, eliminating the Debtors' only source of new revenue, (e) need for incurrence of substantial additional secured debt from their existing lender, (f) inability to obtain

credit from a new lender, (g) inability to obtain third-party buyers for the Debtors' assets, and (h) need for overadvances on their secured debt to meet basic obligations like payroll.

53. Degner breached his duty of loyalty by using his position as the Debtors' president to cause the Debtors to take actions that harmed the Debtors but benefited Degner financially. Degner had a deep and fundamental conflict of interest throughout his tenure as president due to the agreement the Debtors signed with Alpine on the same day that Degner was appointed as president. Under that agreement, each month of continued operation by the Debtors caused Alpine to be paid $33,350, thereby giving Degner a strong financial incentive to prolong the Debtors' operations as long as possible, without considering and regardless of whether those operations benefited or harmed the Debtors. The agreement also provided Degner with a financial incentive of $500,000 to cause the Debtors to incur additional debt before they ceased operations. Ultimately, Degner caused the Debtors to continue operating for 13 months and to incur millions of dollars of additional secured debt – which caused the Debtors to suffer net operating losses of more than $39 million, but resulted in Degner and Alpine receiving almost $600,000 in cash from the Debtors and obtaining a $400,000 claim against the Debtors.

54. As set forth in paragraphs 42 through 44, Degner's breaches of fiduciary duty harmed the Debtors in the amount of at least $36,635,188 (and likely more than $39 million) in net operating losses that the Debtors incurred between April 15, 2016, and the Petition Date.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Trustee prays for judgment against Degner for breach of fiduciary duty in the amount of $36,635,188 (or a greater amount as determined at trial), interest at the maximum legal rate on all sums awarded against Degner, and such other relief as the Court deems proper.

Dated:  January 30, 2020            LANDAU LAW LLP

                                    /s/ Rodger M. Landau
                                    RODGER M. LANDAU
                                    Attorneys for Howard B. Grobstein,
                                    Liquidating Trustee

13

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>Howard B. Grobstein, Liquidating Trustee | **DEFENDANTS**<br>Gerik M. Degner |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Landau Law LLP<br>1880 Century Park East, Suite 1101<br>Los Angeles, CA 90067 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☑ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Breach of Fiduciary Duty

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 36,635,188. |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>SOLID LANDINGS BEHAVIORAL HEALTH, INC., et al | BANKRUPTCY CASE NO.<br>8:17-bk-12213-CB | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>C. Bauer |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br>Howard B. Grobstein, Liquidating Trustee | DEFENDANT<br>Alpine Pacific Capital, LLC, and Gerik M. Degner | ADVERSARY PROCEEDING NO.<br>8:20-ap-01007-CB |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Central District | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>C. Bauer |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Rodger M. Landau | | |
| DATE<br>January 30, 2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Rodger M. Landau | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| RODGER M. LANDAU (State Bar No. 151456)<br>rlandau@landaufirm.com<br>MONICA RIEDER (State Bar No. 263250)<br>mrieder@landaufirm.com<br>LANDAU LAW LLP<br>1880 Century Park East, Suite 1101<br>Los Angeles, California 90067<br>Telephone: (310) 557-0050<br>Facsimile: (310) 557-0056<br><br>*Attorney for Plaintiff* Howard B. Grobstein, Liquidating Trustee | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| In re:<br>SOLID LANDINGS BEHAVIORAL HEALTH, INC., et al<br><br><br>Debtor(s). | CASE NO.: 8:17-bk-12213-CB<br>CHAPTER: 11<br>ADVERSARY NO.: |
|---|---|
| HOWARD B. GROBSTEIN, LIQUIDATING TRUSTEE<br><br><br>Plaintiff(s)<br>Versus<br>GERIK M. DEGNER,<br><br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page. The deadline to file and serve a written response is _____. If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

**Hearing Date:** _____
**Time:** _____
**Courtroom:** _____

**Address:**
☐ 255 East Temple Street, Los Angeles, CA 90012
☐ 3420 Twelfth Street, Riverside, CA 92501
☒ 411 West Fourth Street, Santa Ana, CA 92701
☐ 1415 State Street, Santa Barbara, CA 93101
☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                                    Page 1                                    **F 7004-1.SUMMONS.ADV.PROC**

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.**  All parties must read and comply with the rule, even if you are representing yourself.  You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference.  A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH).  If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference.  **The court may fine you or impose other sanctions if you do not file a status report.  The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

                                      **KATHLEEN J. CAMPBELL**
                                      **CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
                      Deputy Clerk

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*　　　　　　　　　　　　　　Page 2　　　　　　　　　　　　F 7004-1.SUMMONS.ADV.PROC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:
_____
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____    _____
*Date*         *Printed Name*            *Signature*

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*    Page 3    **F 7004-1.SUMMONS.ADV.PROC**